# Westlaw.

--- F.3d ----  
--- F.3d ----, 2008 WL 2609253 (C.A.7 (Ind.))  
(Cite as: --- F.3d ----, 2008 WL 2609253 (C.A.7 (Ind.)))

Page 1

H  
United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Service Workers Intern. Union v. TriMas Corp.  
C.A.7 (Ind.),2008.  
Only the Westlaw citation is currently available.  
United States Court of Appeals,Seventh Circuit.  
UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, Plaintiff-Appellee,  
v.  
TRIMAS CORPORATION, Defendant-Appellant.  
No. 07-1688.

Argued Nov. 29, 2007.  
Decided July 3, 2008.

**Background:** Labor union brought action against employer seeking to compel arbitration of dispute concerning the unionization of workforce at employer's manufacturing plant under the Labor Management Relations Act (LMRA). The United States District Court for the Northern District of Indiana, Theresa L. Springmann, J., 2007 WL 608393, granted summary judgment in favor of labor union. Employer appealed.

**Holdings:** The Court of Appeals, Cudahy, Circuit Judge, held that:  
(1) dispute was within scope of arbitration clause in parties' neutrality agreement, and  
(2) any evidence that parties orally modified their neutrality agreement was irrelevant to the issue of whether the parties' dispute was arbitrable.

Affirmed.

**[1] Alternative Dispute Resolution 25T ⇐ 213(5)**

25T Alternative Dispute Resolution  
  25TII Arbitration  
    25TII(D) Performance, Breach, Enforcement, and Contest  
      25Tk204 Remedies and Proceedings for Enforcement in General  
        25Tk213 Review  
          25Tk213(5) k. Scope and Standards of Review. Most Cited Cases  
The Court of Appeals reviews a district court's decision to compel arbitration de novo.

**[2] Alternative Dispute Resolution 25T ⇐ 112**

25T Alternative Dispute Resolution  
  25TII Arbitration  
    25TII(A) Nature and Form of Proceeding  
      25Tk112 k. Contractual or Consensual Basis. Most Cited Cases

**Alternative Dispute Resolution 25T ⇐ 143**

25T Alternative Dispute Resolution  
  25TII Arbitration  
    25TII(B) Agreements to Arbitrate  
      25Tk142 Disputes and Matters Arbitrable Under Agreement  
        25Tk143 k. In General. Most Cited Cases  
Before a court compels arbitration, the court first must determine whether the parties have agreed to arbitrate the particular dispute, for a duty to arbitrate can arise only by agreement.

**[3] Alternative Dispute Resolution 25T ⇐ 200**

25T Alternative Dispute Resolution  
  25TII Arbitration  
    25TII(D) Performance, Breach, Enforcement, and Contest  
      25Tk197 Matters to Be Determined by Court  
        25Tk200 k. Arbitrability of Dispute. Most Cited Cases  
Whether a party has agreed to arbitrate a particular dispute is a question for the courts to decide.

**[4] Alternative Dispute Resolution 25T ⇐ 203**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 5**

Case 1:07-cv-07163   Document 15-8   Filed 07/29/2008   Page 2 of 9

--- F.3d ----
Page 2
--- F.3d ----, 2008 WL 2609253 (C.A.7 (Ind.))
(Cite as: --- F.3d ----, 2008 WL 2609253 (C.A.7 (Ind.)))

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(D) Performance, Breach, Enforcement, and Contest
         25Tk197 Matters to Be Determined by Court
            25Tk203 k. Merits of Controversy. Most Cited Cases

In determining the issue of arbitrability, the court will not rule on the potential merits of the underlying case unless it is absolutely necessary.

[5] **Alternative Dispute Resolution** 25T ⇌198

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(D) Performance, Breach, Enforcement, and Contest
         25Tk197 Matters to Be Determined by Court
            25Tk198 k. In General. Most Cited Cases

If the parties have in fact agreed to arbitrate their dispute, then they have bargained for the arbitrator's interpretation of their contract, not the court's interpretation.

[6] **Alternative Dispute Resolution** 25T ⇌143

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk142 Disputes and Matters Arbitrable Under Agreement
            25Tk143 k. In General. Most Cited Cases

A court will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

[7] **Alternative Dispute Resolution** 25T ⇌210

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(D) Performance, Breach, Enforcement, and Contest
         25Tk204 Remedies and Proceedings for Enforcement in General
            25Tk210 k. Evidence. Most Cited Cases

Where the arbitration clause is broad, there is a presumption in favor of arbitrability.

[8] **Alternative Dispute Resolution** 25T ⇌139

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk136 Construction
            25Tk139 k. Construction in Favor of Arbitration. Most Cited Cases

Any ambiguities as to the scope of the arbitration clause are resolved in favor of arbitration.

[9] **Alternative Dispute Resolution** 25T ⇌143

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk142 Disputes and Matters Arbitrable Under Agreement
            25Tk143 k. In General. Most Cited Cases

The scope of the arbitration clause is established by the text of the arbitration clause itself.

[10] **Alternative Dispute Resolution** 25T ⇌137

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk136 Construction
            25Tk137 k. In General. Most Cited Cases

A court interprets arbitration clauses according to their plain meaning and, in construing language, the court strives for a commonsense result.

[11] **Alternative Dispute Resolution** 25T ⇌137

25T Alternative Dispute Resolution
   25TII Arbitration

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----
Page 3
--- F.3d ----, 2008 WL 2609253 (C.A.7 (Ind.))
(Cite as: --- F.3d ----, 2008 WL 2609253 (C.A.7 (Ind.)))

    25TII(B) Agreements to Arbitrate
       25Tk136 Construction
          25Tk137 k. In General. Most Cited Cases

General principles of contract interpretation inform the court's analysis of an arbitration clause but only to the extent that they comport with the federal policy in favor of arbitration.

**[12] Labor and Employment 231H ⇐1549(7)**

231H Labor and Employment
   231HXII Labor Relations
      231HXII(H) Alternative Dispute Resolution
         231HXII(H)3 Arbitration Agreements
            231Hk1543 Construction and Operation
              231Hk1549 Matters Subject to Arbitration Under Agreement
                 231Hk1549(7) k. Particular Disputes in General. Most Cited Cases

Dispute between labor union and employer, concerning whether employer's manufacturing plant was a covered workplace, pursuant to parties' neutrality agreement, was within scope of arbitration clause in agreement, which stated that any alleged violation or dispute involving the terms of the agreement could be brought to arbitration.

**[13] Labor and Employment 231H ⇐1549(7)**

231H Labor and Employment
   231HXII Labor Relations
      231HXII(H) Alternative Dispute Resolution
         231HXII(H)3 Arbitration Agreements
            231Hk1543 Construction and Operation
              231Hk1549 Matters Subject to Arbitration Under Agreement
                 231Hk1549(7) k. Particular Disputes in General. Most Cited Cases

**Labor and Employment 231H ⇐1587**

231H Labor and Employment
   231HXII Labor Relations
      231HXII(H) Alternative Dispute Resolution
         231HXII(H)4 Proceedings
            231Hk1584 Evidence
              231Hk1587 k. Admissibility. Most Cited Cases

Any evidence that the labor union and employer orally modified their neutrality agreement to exclude a manufacturing plant that was previously covered by the agreement was irrelevant to the issue of whether the parties' dispute was arbitrable, under arbitration clause contained in agreement, where parties did not deny the existence of the arbitration clause, and the parties' alleged modification of the agreement did not include taking steps to narrow the reach of the arbitration clause.

**[14] Alternative Dispute Resolution 25T ⇐140**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(B) Agreements to Arbitrate
         25Tk140 k. Severability. Most Cited Cases

As a matter of federal law, arbitration clauses are separable from the contracts in which they are embedded, at least when there is no indication that the parties have intended otherwise.

**[15] Alternative Dispute Resolution 25T ⇐199**

25T Alternative Dispute Resolution
   25TII Arbitration
      25TII(D) Performance, Breach, Enforcement, and Contest
         25Tk197 Matters to Be Determined by Court
            25Tk199 k. Existence and Validity of Agreement. Most Cited Cases

A party who contests the making of a contract containing an arbitration provision cannot be compelled to arbitrate the threshold issue of the existence of an agreement to arbitrate.

**[16] Alternative Dispute Resolution 25T ⇐199**

25T Alternative Dispute Resolution

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-07163    Document 15-8    Filed 07/29/2008    Page 4 of 9

--- F.3d ----                                                                                    Page 4
--- F.3d ----, 2008 WL 2609253 (C.A.7 (Ind.))
(Cite as: --- F.3d ----, 2008 WL 2609253 (C.A.7 (Ind.)))

25TII Arbitration
    25TII(D) Performance, Breach, Enforcement, and Contest
        25Tk197 Matters to Be Determined by Court
            25Tk199 k. Existence and Validity of Agreement. Most Cited Cases

Once the existence of the agreement to arbitrate is established, questions about the enforceability of the underlying contract are left to the arbitrator, even when a party attempts to rescind or avoid the contract in which the arbitration clause is embedded.

Appeal from the United States District Court for the Northern District of Indiana, Fort Wayne Division. No. 06 C 32-Theresa L. Springmann, Judge.
Richard J. Swanson, Macey Swanson & Allman, Indianapolis, IN, for Plaintiff-Appellee.
James M. Stone, Jackson Lewis, Cleveland, OH, for Defendant-Appellant.

Before CUDAHY, POSNER, and EVANS, Circuit Judges.

CUDAHY, Circuit Judge.
*1 The defendant TriMas Corporation (TriMas) owns a number of heavy manufacturing plants in the Midwest. In July 2003, it signed a neutrality agreement with an organization whose name is a "mouthful"-the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (Union). In essence, TriMas agreed to cooperate with Union efforts to organize its workforce, at least within certain parameters. The agreement specified that any disputes regarding the terms of the agreement would be settled by arbitration.

In 2005, the Union informed TriMas of its intention to organize the Rieke plant, a TriMas facility in Auburn, Indiana. The Union believes that the Rieke plant is a "covered workplace" subject to the provisions of the agreement requiring neutrality. TriMas, however, refused to accord neutrality to the Union. TriMas claimed that the plain language of the neutrality agreement was not controlling because the neutrality agreement had been modified by an oral side agreement. The modified agreement applied to only three or four plants, it argued, and the Rieke plant was not one of them. When the Union insisted that they submit the dispute to arbitration, TriMas again refused. It characterized the dispute as one involving the "scope" of the agreement itself and so claimed that it had no duty to submit it to arbitration.

The Union then brought this action in federal court to compel arbitration under the Labor-Management Relations Act (LMRA).See29 U.S.C. § 185(a). The parties filed cross-motions for summary judgement, and the district court granted the Union's motion. TriMas now appeals, claiming that the district court "ignored" the extrinsic evidence that would have established the existence of the side agreement. We believe that the district court was correct in finding that the dispute was covered by the language of the arbitration clause and in leaving consideration of the extrinsic evidence to the arbitrator.

I.

Heartland Industrial Partners (Heartland) is an investment banking fund that was set up to facilitate investments in the heavily unionized "smokestack" industries of the Midwest. Heartland's president, David Stockton, wanted to foster a positive relationship with the Union and sought an early agreement on neutrality with respect to organizing matters. Stockman met with Ron Bloom, the Special Assistant to the President of the Union, whom Stockman knew from the days when they both worked as investment bankers. On November 27, 2000, Heartland signed a neutrality agreement with the Union (Heartland Agreement), which actually consisted of a long letter from Stockman to Union President Leo Girard as well as a framework agreement. Heartland agreed to remain neutral during union organizing efforts and to recognize a union if a majority of employees signed cards authorizing the Union to represent them. The Heartland Agree-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-07163     Document 15-8     Filed 07/29/2008     Page 5 of 9

--- F.3d ----                                                                                        Page 5
--- F.3d ----, 2008 WL 2609253 (C.A.7 (Ind.))
(Cite as: --- F.3d ----, 2008 WL 2609253 (C.A.7 (Ind.)))

ment also provided that it would be binding on business enterprises that Heartland owned, directed or controlled.[FN1] Heartland also agreed that, when new companies came under Heartland control, Heartland would direct them to execute their own neutrality agreements with the Union. For example, when Heartland acquired control of a company called Metaldyne Corporation (Metaldyne), Metaldyne immediately executed its own neutrality agreement with the Union.

*2 In early 2002, the Union launched a campaign to organize workers at a Metaldyne plant in Hamburg, Michigan. Although the drive was ultimately successful, it left a bitter feeling on both sides. The Union claimed that Metaldyne had not cooperated during its organizing efforts, while Metaldyne complained that the Union had not given it proper warning before beginning the campaign. If it had been given proper warning, Metaldyne claimed, it could have warned the Union that sentiment at the Hamburg plant was more staunchly anti-union than at other plants.

In late September 2002, Stockman and Bloom began discussing ways to avoid a repetition of the Hamburg debacle. They reached an informal agreement regarding the "sequencing" of future organizing drives in order to ensure that the plants targeted for organizing were amenable to such efforts. A series of meetings and conference calls followed. Stockman sent a memorandum that outlined the sequencing arrangement to key officials throughout his company. Stan Johnson, then the Director of Organizing for the Union, also sent out a memorandum to his colleagues. On October 31, 2002, the key players met at the Detroit Airport to finalize these plans. In preparation for the meeting, Stockman had composed a memorandum that reflected his understanding of the agreements made with Bloom (Airport Memorandum). The memorandum was distributed to all the parties at the airport meeting. The union never signed it, however, and no other written agreement was executed as a result of the meeting. As we shall see, the parties dispute the precise nature of the agreement reached at the Detroit Airport. TriMas claims that the parties agreed to narrow the application of the Heartland Agreement to a short list of plants, while the Union claims that the parties agreed informally on the order in which the first plants would be organized.

TriMas Corporation was created as a spin-off from Metaldyne shortly before the airport meeting, which TriMas President Grant Beard attended. TriMas is a subsidiary of Heartland and, on July 11, 2003, more than eight months after the airport meeting, TriMas and the Union executed a neutrality agreement. The TriMas Neutrality Agreement consisted of two complimentary agreements: the "Framework for a Constructive Bargaining Relationship" (Framework Agreement) and a side letter agreement (Side Letter). The text of this agreement is similar to the Heartland Agreement. It includes an arbitration clause that reads, in relevant part, as follows: "Any alleged violation or dispute involving the terms of this Framework Agreement may be brought to [arbitration]." Like the Heartland Agreement, it also contains an integration clause that forbids oral modifications to the contract.

But things did not go smoothly. In the summer of 2004, the parties had a dispute over the applicability of the TriMas Agreement to a TriMas plant in Frankfort, Indiana. TriMas refused to cooperate with Union efforts to organize the plant. The parties also disagreed in September 2004 about the Agreement's applicability to a TriMas plant in Houston, Texas. The Union filed a grievance under the dispute resolution provisions of the Agreement but TriMas refused to go to arbitration. TriMas insisted that the TriMas Agreement applied only to the three plants agreed upon at the airport meeting (Goshen, Wood Dale and Longview) and one plant agreed upon at a later date (Frankfort). TriMas asserted that it had no duty to arbitrate the applicability of the agreement to other plants. The Frankfort suit was settled on April 7, 2005, although both parties still clung to their own interpretations of the Neutrality Agreement.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*3 TriMas owned a subsidiary, Rieke Corporation, which operated a manufacturing facility in Auburn, Indiana. The Union tried to get assurances from TriMas that it would remain neutral during the effort at Rieke, but TriMas officials refused. TriMas also refused to submit the dispute to arbitration.

On February 1, 2006, the Union filed the present action under § 301 of the LMRA to compel TriMas to submit to arbitration. Both parties filed motions for summary judgment on November 14, 2006. On February 22, 2007, the district court denied TriMas's motion for summary judgment and granted the Union's motion for summary judgment. This appeal follows.

II.

TriMas appears to concede that the plain language of the arbitration clause applies to the dispute whether the Rieke plant is a "covered workplace" under the agreement. Nevertheless, TriMas argues that the plain language of the clause should not control because the agreement in which the clause is embedded was modified by an oral side agreement. This oral side agreement, which was allegedly reached at the October 21, 2002 meeting at the Detroit Airport, supposedly narrowed the agreement's application to only four plants: Goshen, Wood Dale, Longview and Frankfort. Thus, TriMas claims that it should not be required to arbitrate the applicability of the agreement to the Rieke plant. The district court, however, refused to consider any evidence relating to the alleged side agreement and instead issued an order compelling arbitration.

[1][2][3] We review a district court's decision to compel arbitration de novo. See Int'l Broth. of Elec. Workers, Local 21 v. Illinois Bell Tel. Co., 491 F.3d 685, 688 (7th Cir.2007). Before we compel arbitration, we first must determine whether TriMas has agreed to arbitrate this particular dispute, for a duty to arbitrate can arise only by agreement. See United Steelworkers of America v. Warrior & Gulf, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Whether a party has agreed to arbitrate a particular dispute is a question for the courts to decide. See AT & T Techs., Inc. v. Communc'ns Workers of America, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).

[4][5] We must remain mindful, however, of the limited role we play at this stage. As we have previously explained, our role in deciding arbitrability is essentially that of a "gatekeeper." See Air Line Pilots Ass'n, Int'l v. Midwest Express Airlines, Inc., 279 F.3d 553, 558 (7th Cir.2002) (Ripple, J., concurring in part and dissenting in part). We are responsible *only* for the question of arbitrability. We will not "rule on the potential merits of the underlying case" unless it is absolutely necessary. AT & T Techs., 475 U.S. at 649, 106 S.Ct. 1415, 89 L.Ed.2d 648. If the parties have in fact agreed to arbitrate their dispute, then they have bargained for *the arbitrator's* interpretation of their contract-not ours. "[P]utting ... matters in the hands of specialists rather than judges or jurors is one attraction of arbitration."*Sphere Drake Ins. Ltd. v. All American Ins. Co.*, 256 F.3d 587, 592 (7th Cir.2001). If we were to weigh in on the merits of their case, we would be denying them the benefit of that bargain.

*4 [6][7][8] The question we must answer, then, is narrow. We must determine whether the Union is making a claim that is, "on its face," governed by the TriMas Agreement. *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). We will compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."*Warrior & Gulf*, 363 U.S. at 582-83, 80 S.Ct. 1347, 4 L.Ed.2d 1409. Where the arbitration clause is broad, there is a presumption in favor of arbitrability. *AT & T Techs.*, 475 U.S. at 650, 106 S.Ct. 1415, 89 L.Ed.2d 648. Any "ambiguities as to the scope of the arbitration clause are resolved in favor of arbitration."*Volt Info. Sci., Inc. v. Board of Trs. of Leland Stanford, Jr. Univ.*, 489 U.S. 468, 475-76, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-07163    Document 15-8    Filed 07/29/2008    Page 7 of 9

--- F.3d ----                                                                    Page 7
--- F.3d ----, 2008 WL 2609253 (C.A.7 (Ind.))
(Cite as: --- F.3d ----, 2008 WL 2609253 (C.A.7 (Ind.)))

[9] Although TriMas complains that the district court "ignored" critical evidence, we think the district court was correct to do so. The evidence TriMas offered was irrelevant to the question of arbitrability because it did not concern the interpretation of the arbitration clause itself. The scope of the arbitration clause is established by the text of the arbitration clause itself; because there is no evidence that the parties modified that clause, the scope of arbitrability remains the same. One does not remove issues from arbitration simply by changing the scope of the underlying agreement. The ultimate dispute between the parties concerns the applicability of the neutrality provisions of the TriMas Agreement to the Rieke plant. Because this dispute is covered by the plain language of the arbitration clause and by nothing else, it should be submitted to arbitration.

A.

[10][11] We begin with the text of the arbitration clause. *See Illinois Bell*, 491 F.3d at 688. We interpret arbitration clauses according to their plain meaning and, in construing language, we strive for a commonsense result. *See Air Line Pilots*, 279 F.3d at 556. General principles of contract interpretation inform our analysis but only to the extent that they comport with the federal policy in favor of arbitration. *See American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; *Warrior & Gulf*, 363 U.S. at 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409. We turn, then, to the clause at issue.

[12] The arbitration clause, which is found in Section G of the Framework Agreement, provides that "[a]ny alleged violation or dispute involving the terms of this Framework Agreement may be brought to [arbitration]." This is a standard arbitration clause. It applies both to "[a]ny alleged violation" and to "[any alleged] dispute." "Any" alleged violation or dispute, in this case, means "all" alleged violations and disputes. Further, the alleged violation or dispute need only "involv[e]" the terms of the Agreement, and the phrase "terms of the Agreement" is broad enough to encompass the entire agreement. The Agreement does not exclude any category of disputes from the reach of the arbitration clause. The parties could have provided that "legal issues" or "issues pertaining to the scope of the agreement" were not subject to the arbitration requirement but they did not. It is thus clear that we are dealing with an extremely broad arbitration clause.

*5 It is equally clear that the present dispute is, on its face, covered by the arbitration clause. *See American Mfg. Co.*, 363 U.S. at 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403. The Union alleges a "violation" of the TriMas Agreement since the Union claims that TriMas refused to accord neutrality to the Union even though it had an obligation to do so. In essence, the parties ultimately dispute whether the Rieke plant is covered by the TriMas Agreement. But the TriMas Agreement itself defines what is or is not a "covered workplace." A "covered workplace" is, according to the agreement, "any workplace which is: (i) controlled by the Company, as the Company is defined in Section E herein; and (ii) employs or intends to employ employees who are eligible to be represented by a labor organization in any unit(s) appropriate for bargaining." The Union claims that the Rieke plant is a "covered workplace" under the agreement, and thus this dispute is a dispute over the "terms" of the agreement.[FN2]

TriMas argues that a dispute over the scope of the agreement somehow transcends the meaning of the "terms" of the agreement-an issue which is arbitrable. But such an argument is unavailing in this case because the parties explicitly addressed the intended scope of the agreement in their contract, the terms of which are arbitrable. Put simply, "scope" is a term of the agreement and, as such, is subject to arbitration. It makes no difference that the TriMas Agreement does not list the specific plants that it covers; it provides arbitrable criteria by which that determination can be made. The Union claims that the Rieke plant satisfies these criteria, so the arbitration clause is certainly "susceptible to an inter-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-07163    Document 15-8    Filed 07/29/2008    Page 8 of 9

--- F.3d ----                                                                                    Page 8
--- F.3d ----, 2008 WL 2609253 (C.A.7 (Ind.))
(Cite as: --- F.3d ----, 2008 WL 2609253 (C.A.7 (Ind.)))

pretation" that covers the dispute. "Nothing more is required to establish the arbitrability of the dispute."*Air Line Pilots,* 279 F.3d at 555.

### B.

[13] There is thus a presumption of arbitrability in this case. TriMas can rebut this presumption only if it can produce "the most forceful evidence of a purpose to exclude the claim from arbitration ."*See AT & T Techs.,* 475 U.S. at 650, 106 S.Ct. 1415, 89 L.Ed.2d 648. Of course, TriMas believes it *has* such evidence. Specifically, it points to deposition testimony from Stockman and Beard stating that the scope of the agreement was narrowed at the airport meeting. It offers copies of memoranda distributed before and after the airport meeting by both Stockman and Bloom, which it claims suggest that the agreement was modified; it is also prepared to offer expert testimony from John Toner to the effect that oral side agreements are common in labor contracts. The district court, however, refused to consider the evidence that TriMas pressed upon it. It reasoned that "[e]ven if the parties modified their original Neutrality Agreement with an oral side agreement, ... there is no evidence that they took steps to narrow the reach of the arbitration clause."We agree with the district court's analysis.

*6 [14] The evidence offered by TriMas is inadequate as a matter of law because it does not purport to show that the arbitration clause itself means something other than what it appears to mean on its face. *See Air Line Pilots,* 279 F.3d at 556. As a matter of federal law, arbitration clauses are " 'separable' from the contracts in which they are embedded," at least when there is no indication that the parties have intended otherwise. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 402, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Thus, to avoid arbitration, TriMas needed to show that the alleged modification was "directed to the arbitration clause itself."*Id.* at 402, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270. This distinction may seem "puzzling" but it simply reflects the limited role we play in deciding questions of arbitrability. *Matterhorn, Inc. v. NCR Corp.,* 763 F.2d 866, 868-69 (7th Cir.1985). If the rule were otherwise, it would be relatively easy to manufacture a dispute over arbitability by raising extrinsic attacks on the contract in which the arbitration clause is embedded. We would then be required to interpret the substantive provisions of the agreement and become entangled in the merits of the dispute-a result we try to avoid. *See AT & T Techs.,* 475 U.S. at 649, 106 S.Ct. 1415, 89 L.Ed.2d 648.

Application of the "separability" rule is dispositive in this case. TriMas has presented no evidence that the parties agreed at the airport meeting to limit the scope of the arbitration clause itself. The evidence does not suggest, for example, that disputes over whether a particular plant was a "covered workplace" would no longer be subject to arbitration. Indeed, the evidence does not suggest that arbitration was ever discussed at that meeting. The evidence offered by TriMas is therefore irrelevant to the question of arbitrability, although it may turn out to be relevant to the question of scope itself. We leave that to the arbitrator.

[15][16] Things would be different if TriMas denied the very existence of the contract containing the arbitration clause. For "a party who contests the making of a contract containing an arbitration provision cannot be compelled to arbitrate the threshold issue of the *existence* of an agreement to arbitrate."*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.,* 925 F.2d 1136, 1140-41 (9th Cir.1991). TriMas, however, does not dispute that it is a party to this agreement and that it is bound by it. Once the existence of the agreement to arbitrate is established, questions about the enforceability of the underlying contract are left to the arbitrator, even when a party attempts to rescind or avoid the contract in which the arbitration clause is embedded. *See Three Valleys,* 925 F.2d at 1140. This is certainly true when a side agreement is alleged to preclude the enforcement of the contract at issue. *See American Mfg.,* 363 U.S. at 564, 80 S.Ct. 1343,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4 L.Ed.2d 1403;*Air Line Pilots,* 279 F.3d at 556-57. In *American Mfg.,* one of the seminal cases in this area of the law, the employer claimed that a dispute that, on its face, was covered by a collective bargaining agreement had been removed from the agreement's scope by a separate settlement agreement. The Court held, however, that the effect of the side agreement on the collective bargaining agreement was for the arbitrator to decide. *See American Mfg.,* 363 U.S. at 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403. We have reached similar results. *See, e.g., Air Line Pilots,* 279 F.3d at 556-57. As the Fourth Circuit has succinctly explained, "[e]ven if we assume that the parties did attempt to settle [an] issue, otherwise arbitrable, by agreement, any disagreement as to the existence or effect of that settlement agreement would itself be a matter for the arbitrator to decide."*Norfolk & Western Rwy. Co. v. Employees Protective Ass'n,* 571 F.2d 185, 193 (4th Cir.1977); *accord Sphere Drake,* 256 F.3d at 592 ("Whether an extrinsic ambiguity is so vital as to preclude enforcement is exactly the sort of question that an arbitrator is supposed to handle"). Because TriMas does not dispute the existence of the TriMas Agreement, questions about its scope are properly left to the arbitrator.

*7 In sum, this dispute is essentially over whether the Rieke plant is a "covered workplace" under the TriMas Agreement. This dispute is arbitrable under the plain language of the arbitration clause. TriMas has presented no evidence that the scope of the arbitration clause was itself narrowed to exclude disputes over the meaning of the term "covered workplace." The presumption of arbitrability has not been rebutted, and the district court was correct to send this case to arbitration.FN3

III.

For the reasons discussed above, the decision of the district court to compel arbitration is affirmed. TriMas shall bear the costs of this appeal.

FN1. We speak roughly here; the provisions in the Heartland Agreement are more precise. A "covered business enterprise" is defined as "any business enterprise in which Heartland, directly or indirectly: (1) owns more than 50 percent of the common stock; (ii) controls more than 50 percent of the voting power, or (iii) has the power, based on contracts, constituent documents or other means, to direct the management and policies of the enterprise."

FN2. TriMas claims that "no listing of plants covered were [sic] included in the document, as the parties had already agreed to the arrangements at the Airport Memorandum."This ignores the fact that the parties included a provision concerning "covered workplaces." TriMas responds that this language was "boilerplate" transplanted from the Heartland Neutrality Agreement. But plain language contained in the agreement cannot be avoided by characterizing it as "boilerplate."

FN3. TriMas also argues that the agreement made at the airport meeting was a novation of the Heartland Agreement. This is a rather strange argument because the airport meeting actually *preceded* the formation of the TriMas Agreement, which is the contract at issue in this case. In any case, we express no opinion on this issue for the reasons explained above. Whether the TriMas Agreement survived a subsequent agreement is a question for the arbitrator to decide. *See Sphere Drake,* 256 F.3d at 592;*Norfolk & Western,* 571 F.2d at 193.

C.A.7 (Ind.),2008.
United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Service Workers Intern. Union v. TriMas Corp.
--- F.3d ----, 2008 WL 2609253 (C.A.7 (Ind.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.